MISSOURI PACIFIC RAILROAD COMPANY *v.* HENDERSON.

4-4755

Opinion delivered November 1, 1937.

*Daggett & Daggett,* for appellants.

*Hugh U. Williamson* and *Tom W. Campbell,* for appellees.

BUTLER, J. The plaintiffs, Henderson and Stanfill, brought an action in the Poinsett circuit court to recover damages for injuries alleged to have been occasioned by the joint and concurrent negligence of de-

fendant company and N. B. Pyle and A. M. Lambertus, engineer and fireman in charge of the operation of a locomotive, tender and water-tank attached, the property of said company. The injuries received by plaintiffs occurred at a public crossing in the city of Newport and was occasioned by a collision between the water tank, which was being backed toward and across the crossing, and an automobile in which plaintiffs were riding as the guests of one, Ingram. The defense was a general denial of the allegations of negligence, and the affirmative defense that plaintiffs were guilty of contributory negligence to an extent that would bar recovery. The trial resulted in a verdict and judgment for the plaintiffs against the defendant company, plaintiff Henderson being awarded the sum of $20,000 and plaintiff Stanfill $5,000. No verdict was returned by the jury against the employees of the defendant company, the verdict being silent as to them.

On appeal the appellant company seeks a reversal of the judgment (1) on the ground that there is no substantial testimony to support the verdict; (2) that the evidence is insufficient to sustain the finding of the jury that the negligence of the corporate defendant equaled or exceeded in degree the negligence of the plaintiffs; (3) that the verdicts are excessive and palpably the result of passion and prejudice; (4) for error in the admission of incompetent testimony; (5) and (6) for errors in declarations of law; (7) for errors in instructions on the measure of damages.

The point at which the accident occurred is in the town of Newport where one of its main streets crosses the railroad from west to east at approximately right angles, the tracks of said railroad running, at that point, approximately due north and south. The automobile in which plaintiffs were riding was approaching the crossing from the west. At the crossing the railroad consisted of three tracks. The center track is called the southbound main track. As the automobile approached the crossing, part of the train, consisting of a locomotive, tender and water tank, was south of the crossing and in the act of backing north to pass over the crossing. Just

to the north, on one of the tracks, a number of cars were standing. The collision occurred just as the automobile was crossing the main, or center, track of the railroad.

The testimony tending to establish the contentions of the plaintiffs as to the negligence of defendants and their own freedom from negligence was given by themselves, Ingram, the driver of the automobile who was not a party to the suit, and John Moore, who, just before, and at the time of, the collision, was walking north along the railroad track a short distance south of the crossing. The locomotive had passed Moore, and he was about fifty or seventy-five feet south of the crossing at the time of the impact of the water tank and the automobile.

With respect to the negligence of the defendants in the operation of the locomotive, the testimony given by the above witnesses is to the effect that no warning of any kind was given of the approach of the locomotive, that no lookout was kept either on the water tank or on the ground at the crossing, and that the locomotive was approaching at an estimated speed of approximately twenty miles an hour. With respect to the due care exercised by Ingram in the operation of the automobile, the testimony is to the effect that he was approaching the crossing at a moderate rate of speed; that all three of the occupants of the automobile observed the red light, and knew that this indicated a train in the "block"; that their view was obscured to the south, but that they could, and did, look to the north as they approached and saw a string of box cars standing to the north of the crossing within the block, the presence of which they thought was the cause of the showing of the red light; that they apprehended no danger as these cars were standing still and continued to move toward the crossing. On their right, and to the south, there were a number of small houses fronting on the street. Back of these, still further south, were other small houses fronting toward the railroad tracks. Between the two groups of houses and the railroad tracks were some small trees or bushes, all of which obscured the view to the right until they were passed, which distance from the tracks was variously estimated to be from forty-five feet to within

a few feet of the west track of the railway. It was a summer day and the windows of the automobile were open. The occupants of the car, who were duly sober, testified that they heard no noise and saw no signal of an approaching train; that when it was first observed the automobile had reached the west track, and Henderson exclaimed, "Lookout!" The train was then about thirty-five or forty feet away, too close for the driver of the automobile to back out. He tried to go across, and the automobile was struck just before it had cleared the main or center track. The three travelers were seated on the front seat of the automobile.

Opposed to this testimony is that of a dozen or more witnesses who stated that the locomotive was giving the customary signals and backing from the south toward the crossing at from ten to twelve miles an hour with a brakeman standing upon the water tank keeping a lookout in the direction of the crossing. The testimony was further to the effect that the occupants of the automobile were under the influence of intoxicating liquor, a number of witnesses stating that they were drunk and staggering, and, that although warned by some of the bystanders that a train was backing from the south toward the crossing, they drove directly on the track in front of the train from a point where they could have seen, had they looked, the danger to be apprehended.

In this state of the case, eminent counsel for appellants argue that the weight of the evidence is so manifestly contrary to the finding of the jury that this court should disregard the verdict and reverse the judgment of the lower court. Counsel insist that our decision in the case of *Chalfant* v. *Haralson*, 176 Ark. 375, 3 S. W. (2d) 38, where upon the contention that a case was presented in which the verdict was so clearly against the weight of the evidence as to shock the sense of justice of a reasonable person and to call for a reversal, the court denied that contention and this action, it is argued, was a departure from our former decisions and added to the verdicts of juries a sanctity that did not before obtain. We do not think that case susceptible to the interpretation placed upon it by learned counsel, but rather that it

restated the law in conformity with our previous decisions except for certain language used in the case of *Oliver* v. *State,* 34 Ark. 632, and in *Singer Mfg. Co.* v. *Rogers,* 70 Ark. 385, 67 S. W. 75, 68 S. W. 153. The rule is, and has always been, when stripped of unnecessary phrases, that where there is any evidence of a substantial nature, which, by positive statements or reasonable inference, when given its strongest probative value, tends to support the finding of the jury, that finding will be sustained, although, from the record presented to this court, it might seem to be against the preponderance of the credible evidence. We are of the opinion that our decisions upon which appellants rely, *Howell* v. *Webb,* 2 Ark. 360; *Vandever* v. *Wilson,* 5 Ark. 407; *Hazen* v. *Henry,* 6 Ark. 86; *Drennen* v. *Brown,* 10 Ark. 138; *Oliver* v. *State* and *Singer Mfg. Co.* v. *Rogers, supra,* when the facts of each case and points decided are considered, are not sufficient to sustain the contention now made. In fact, the language used in those decisions which might seem to give support to counsel's position in the case at bar is *dicta* and is so recognized in *Chalfant* v. *Haralson, supra.*

In one of our recent cases, *Missouri Pacific Transportation Co.* v. *Sharp, ante* p. 405, 108 S. W. (2d) 579, appellant was represented by counsel of such high standing and learning we thought fit to notice his argument in line with that of eminent counsel for appellants in the instant case, and to cite authorities which supported the rule above stated. In that case, however, the contention was not that this court had departed from rules anciently laid down, but that "because of modern trend, this court would be justified in disregarding them where it appears that the preponderance of the testimony is against the verdict, or the supporting testimony is improbable and unreasonable." There counsel said: "There is no excuse for the highest courts of the country following a blind and unreasonable precedent." Here the argument is that we have departed from precedent, and in these later years have substituted a doctrine new and strange which gives to the verdicts of juries absolute sanctity in any event. This is not so: we have not hesitated in many instances to overturn verdicts where the

evidence was insubstantial, based upon conjecture, or violative of established physical laws. In the case at bar, there is no doubt but that the evidence adduced by the appellees, if true, is substantial in its nature and abundantly sufficient to support the verdict relating to the negligence of the appellants. The sole question is, was that evidence true? The jury found the testimony given for appellees was true, and this finding, when fortified by the conclusion of the trial court, is conclusive of the issue. *Missouri Pacific Transportation Co.* v. *Sharp, supra.*

We pass to the second contention for reversal which presents one of greater difficulty than that first considered. The appellees, Henderson and Stanfill, were invited guests, they had no control over the movement of the automobile in which they were riding, and Ingram's negligence, however gross, cannot be imputed to them. Therefore, we must look to the evidence only as it relates to their failure to exercise ordinary care for their own safety. It is admitted that no one could see to the south of the crossing until a point was reached not more than forty-five feet from the edge of the west track. The evidence is in conflict, in some degree at least, as to the obstruction of the view by the presence of shrubs and telephone posts at that distance from the west track. A picture was introduced in evidence showing a clear and unobstructed view toward the south from a point on the highway about forty-five feet from the crossing. There is testimony which questions the accuracy of this picture as it related to the view of a person approaching the crossing, and there are other circumstances which indicate that, however, correct the picture may be from the point at which it was taken, it would not portray the view of one approaching the crossing from the west. The picture, after all, is only to be considered as other evidence in the case.

In considering the degree of care to be exercised by the appellees, the jury had a right to consider all of the circumstances. One circumstance which tended to show negligence upon the part of the appellees was their admission that they saw the signal lights warning of dan-

ger at a time when the automobile was being driven by Ingram without pause toward the crossing. But their failure to at once admonish the driver of this fact and to require him to stop the car, or to take other precautions, does not convict them of gross negligence *per se,* but is a circumstance, only, to be considered on that question in view of the explanation they made regarding it. The situation presented to appellees is comparable to that in the case of *M. P. Rd. Co.* v. *Huffman, ante* p. 456, 108 S. W. (2d) 479. In that case, another train was within the block, as in this case, which would cause the crossing lights to flash and which was supposed by the witnesses to be the cause of the lights' flashing and not the approach of a train which they did not discover, and which, in fact, caused the injury.

The necessary effect of the verdict exonerating the individual defendants from liability was to convict the appellees of negligence contributing to their injuries; likewise, the verdict fixing liability upon the corporate appellant, necessarily imports a finding that the negligence of the appellees was not as great as that of the appellant. This was the situation in the case of *Miss. River Fuel Corp.* v. *Senn,* 184 Ark. 554, 43 S. W. (2d) 255.

A number of recent cases holding the plaintiffs claiming damages for injuries received could not recover, because their negligence was the proximate cause of their injuries are cited by the appellant. Without reviewing those cases, we deem it sufficient to say that in each a state of facts is presented which readily distinguishes it from the case at bar.

A number of cases parallel to the instant case are cited by the appellees in which it is held that the evidence was sufficient to submit to the jury the question of appellee's negligence as the sole or contributing factor to his injury. We deem it unnecessary to review these cases, for it would serve no useful purpose and unduly lengthen this opinion.

Suffice it to say that under all the circumstances, a case was presented for the jury both as to the negligence of the appellees and its degree, and that we cannot say as a matter of law that their negligence equaled that of

the appellant. Primarily, it was Ingram's duty to operate the car so as not to endanger appellees and, in the exercise of ordinary care, they had the right to rely on the assumption that he would perform this duty. It cannot be said that ordinary care would require the exercise of same attention to the route on their part as was required of Ingram; in fact, it would not be unreasonable to say that passengers in an automobile trust largely, if not wholly, to the skill and care of the driver for their safety.

Counsel call attention to our cases where attention has been called to the noise of an approaching train as being sufficient in itself to give notice of its approach. But in those cases the trains were moving rapidly with a string of cars attached, while in the instant case the locomotive was moving slowly, estimated by appellants at about twelve miles an hour and by appellees at twenty, with only two cars attached. It is obvious that in the case at bar the train and its cars made much less noise than those in the former cases, and it might have been reasonable to believe that the sound of its movement was not sufficiently loud to be heard above the noise of the automobile in which appellees were riding. They had a right to rely to some extent upon warnings of the approach of a train, and, while the jury has found they were negligent in not observing the approach of the train despite the lack of warning, its conclusion that such negligence was not as great as that of the appellant cannot be said to be without substantial evidence to support it.

We pretermit a discussion of the third ground urged for reversal, namely, the excessiveness of the verdict, and pass to a mention of the points contained in the fourth, fifth, sixth and seventh grounds. Objection was made to the introduction of evidence relating to the fact that no watchman was stationed at the crossing and to the mentioning of that fact in instructions Nos. 1 and 4. These instructions, when impartially analyzed, simply informed the jury that if the evidence, by its preponderance, should satisfy the jury that the defendant failed to

keep an efficient lookout, while moving its train, for persons being, or going upon, the crossing, and if the jury found that such failure existed and that this was the proximate cause of the injuries at a time when the persons injured were not guilty of contributory negligence, then defendant would be liable. It is not tenable to say that the effect of the instructions was to impose liability upon the appellant if no watchman was kept at the crossing where an efficient lookout was otherwise maintained and signals given of the approach of the locomotive.

The appellant objected to the giving of the instruction on the measure of damages on the specific ground that it did not instruct the jury, in finding damages for loss of earning power, to reduce the amount of the recovery allowed to its present cash value. Accordingly, the trial court modified the instruction to meet with the objection. Afterward, a specific objection was made to the instruction as modified because it contained no rule by which the present value of future earnings might be ascertained, and further, that the instruction was objectionable in allowing recovery for mental anguish because there was no testimony in the record from which the jury might find that any mental anguish had been suffered. On the last objection to the instruction, while there is no direct testimony on the part of the appellees as to mental anguish endured, there are circumstances from which it might be inferred and which are sufficient for the jury to consider that element of damage. As an arithmetical proposition there is no difficulty in determining the present value of a given sum of money payable in the future, or the income which a fixed sum would buy through a period of years where the investment is sure and the interest per annum fixed and certain. Where these elements do not obtain, however, it is difficult to formulate a rule by which the present worth of future earnings can be ascertained. Ordinarily, and in some cases it is of controlling importance, in considering the present value of future income, to determine what a given sum of money put out at interest will earn that income. But, local conditions must

also be considered and that the amount of interest to be earned would vary from time to time. The method by which the present value of future earnings are to be determined in cases like the one before us, varies and would appear to be more a matter of argument than one of law and doubtless the attorneys for the respective litigants argued this very question before the jury. However, be that as it may, we are not prepared now to say that the trial court erred in refusing the request of the appellants, especially as no instruction was prepared in which the table and rule requested were formulated.

Lastly, we consider the third ground for reversal. The jury awarded the appellee Stanfill $5,000. The correctness of this award rests solely upon the testimony of Stanfill and one other witness who had employed him to drive a truck. This witness testified that Stanfill had worked for him "off and on for ten years" driving a truck; that he did not now want Stanfill to drive a truck at night "because his eyesight is bad" and witness had noticed Stanfill couldn't work if he got hot. In the daytime he could drive a truck as well as any one.

At the time of the accident Stanfill was not considered seriously injured. He left the scene of the accident unaided and walked alone in search of telephone and, while so engaged, was picked up by the ambulance in which Henderson was being carried and taken to Tuckerman for treatment. The only physical evidence that he had been injured were some minor lacerations and bruises. After the accident he started to work for his father who operates a transfer business and worked for him a year and a half. Stanfill stated that his injuries impaired his ability to work at times in hot weather; that when he gets real hot he has a dizziness in the head and turns blind and sick. He estimated that his earning capacity had been reduced by half. Except for the testimony of the corroborating witness, noted above, there is no corroboration of Stanfill's statement regarding his disability. He has consulted no physician nor been under the treatment of any. The accident occurred in August, 1933. Stanfill admitted that in two weeks thereafter he

began work with his father and continued for a year and a half; that he worked with the J. C. Kennedy Construction Company from April until the work was finished June 29th; that he was paid at the same rate as the other men on the job doing the same kind of work; that the following winter he worked for the Ragsdale Construction Company and received the same pay as others engaged in similar work and, having finished with the contractors, he helped his father to haul freight and other things around Tuckerman.

We find no evidence, except that relating to Stanfill's defective vision and dizziness when he became overheated, tending to reflect upon a decrease in earning power; we find no evidence relating to the extent and permanency of his injury or the regularity of any employment he had before the accident, what he earned, or anything else to indicate any certain income he might have reasonably expected to earn in the future. We gather from the nature of work he did that he is a semiskilled laborer earning from 25 to 45 cents per hour when he works and we are compelled, therefore, to conclude that the amount of the verdict is excessive, being based largely upon speculation.

The testimony is almost conclusive that the appellee, Henderson, is permanently disabled; that the effects of the accident as to him were so severe as to render him unconscious for a considerable period of time during which he hemorrhaged from the mouth and nose. It is also evident that for a time he suffered great pain. Several of his ribs on both sides were broken and he suffered severe injuries to other parts of his body, especially to his back, from which he continues to suffer in some degree whenever he undertakes to do any work requiring considerable physical exertion. His injuries are permanent and so serious as to work a great impairment in his ability to work and earn money. At the time of the injury he was forty-one years old, strong and vigorous, earning his living by physical labor; he was an able and willing worker, some of his employers testifying that when he was able to work he was the best

man on the job. It appears further, with reasonable certainty, that he worked at anything there was to do whether as a farm laborer, or in "public work." He earned, beginning in 1926 or 1927, seventy-five cents to a dollar and a quarter a day. Later, he worked during the ginning season at a cotton gin and received approximately sixty dollars per month. He worked on the highway with a construction company receiving 37½ cents an hour for a ten-hour day and just before his accident he had a job which paid him 20 cents per hour and expected to begin work on a bridge job within a few days after the day on which he was injured. Henderson estimated that for a number of years preceding his injuries, he had been making $100 a month.

The jury awarded Henderson the sum of $20,000 for his damages. In view of the testimony, we think this sum excessive. Henderson estimated his earnings had aggregated $100 per month or $1,200 per year. This estimate, however, is not proof, and the circumstances upon which that estimate can be based affirmatively show that it is in excess of the sums he really earned. In the first place, it is clearly inferable from the evidence that Henderson had no certain line of work, or that he was working regularly, but on the contrary that his jobs were intermittent—working here and there as opportunity offered. It is established by the testimony of his own witnesses that his earnings, on an average, did not exceed $2.50 for a ten-hour day. It appears, therefore, that no reasonable basis was established for his conclusion that he made $100 per month for every month during the year. On the contrary, without indulging in speculation as to the regularity of his work, he must have earned much less. It must also be remembered that the necessary conclusion to be drawn from the jury's verdicts is that appellees were negligent and that this was a contributing cause to their injuries. Under the law, the damage for such injuries must be diminished in the proportion such negligence bears to the negligence of appellant.

Appellees insist that a large proportion of the sum awarded Henderson was for physical pain and cite us to

cases where large verdicts were approved based on that element of damage. Of course, there are cases where the pain and suffering are intense and to be endured through the remaining years of life in which a large amount is deemed just compensation. There are cases, also, where the pain and suffering are not endured for a great length of time when a large sum is properly awarded, but in those cases the physical anguish is of an extraordinary nature to the very limit to be endured, and with this there is mental anguish caused by the conscious certainty of the imminency of death. In the case at bar, there is no question of mental anguish save that which comes to one who is conscious of his physical deterioration and the natural anxiety which follows. There is no testimony to lead to the reasonable belief that Henderson will continue to endure any considerable pain. Therefore, the large awards for pain and suffering approved in the cases cited are not justified by the evidence in the case before us.

Without analyzing the evidence further, it seems to sufficiently appear that, in any view of the case, the damages awarded are excessive in any amount exceeding $15,000 for Henderson and $2,000 for Stanfill. We perceive no prejudicial error except as to the amount of the verdicts. The appellees Henderson and Stanfill having entered a remittitur in the sum of $5,000 and $3,000, the judgment is affirmed for Henderson in the sum of $15,000 and for Stanfill in the sum of $2,000.