J. O. KELLY, Plaintiff,

v.

UNITED STATES of America, Defendant.

John E. SULLIVAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 1751, 1750.

United States District Court
W. D. Arkansas,
Fort Smith Division.

May 27, 1964.

James E. Evans, Springdale, Ark., Dickson, Putman, Millwee & Davis, Fayetteville, Ark., for plaintiffs.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

*Civil Action No. 1751—*
*J. O. Kelly, Plaintiff*

On May 3, 1963, J. O. Kelly, the plaintiff in Civil Action No. 1751, filed his complaint in the Circuit Court of Washington County, Arkansas, against O. B. Marvin to recover for personal injuries and property damages to his automobile alleged to have been proximately caused by negligent acts of the defendant, O. B. Marvin, in the operation of an automobile driven by him on April 4, 1963. Upon service of the summons, Marvin reported the occurrence to the United States Attorney, and upon a certification by the Attorney General that the defendant, Marvin, was acting within the scope of his employment as an employee of the United States, a rural mail carrier, at the time the incident occurred out of which the suit arose, the case was removed to this court upon a petition for removal filed by the defendant, O. B. Marvin, on May 29, 1963, as provided in 28 U.S.C. § 2679 (1963 Supp.). On the same date the United States Attorney filed the answer of O. B. Marvin and the defendant, United States, in which they denied the allegations of negligence contained in the complaint, and pleaded that the plaintiff was guilty of contributory negligence which was the sole and proximate cause of the collision between the automobile driven by plaintiff Kelly and the defendant employee, Marvin.

On June 20, 1963, the United States filed its motion to be substituted as party defendant in lieu of the defendant, O. B. Marvin. On the same date the court ordered "that the United States of America be substituted as party defendant in lieu of defendant O. B. Marvin."

On October 18, 1963, the plaintiff Kelly filed his motion to retain O. B. Marvin as party defendant and to require him "to assert any claim which he purports to have against the plaintiff arising out of the facts and circumstances alleged in the complaint of plaintiff." In the alternative, the plaintiff moved the court "to remand any portion of the above styled cause which cannot be disposed of in this court to the Washington Circuit Court from which it came for final disposition." On October 28, 1963, the court denied the motion of plaintiff Kelly to retain the rural mail carrier and original defendant, O. B. Marvin, as a party defendant.

On March 18, 1964, the plaintiff Kelly, having obtained leave of the court, filed an amendment to his complaint in which he alleged that immediately preceding the collision between his automobile and the automobile of Marvin the fair market value of his automobile was $5,600, and immediately after the collision the market value of the automobile was $1,500; that he had suffered property damage because of the collision in the sum of $4,100 and was entitled to recover from the defendant the sum of $32,600 for personal injuries and property damage.

*Civil Action No. 1750—John*
*E. Sullivan, Plaintiff*

On May 16, 1963, the plaintiff Sullivan filed his complaint in this court against the United States of America, in which he alleged that on April 4, 1963, he was riding as a guest in an automobile traveling along U. S. Highway 71 at a place approximately 4½ miles north of Mountainburg, Arkansas, when one O. B. Marvin drove his motor vehicle out of a private driveway onto the said highway and collided with the automobile in which he was then riding as a guest.

Sullivan further alleged that at the time of the collision of the automobile being driven by Marvin with the automobile in which he was riding as a guest, that the said Marvin was an employee of the United States Postal Department, and was acting within the scope of his employment and in behalf of the United States Postal Department in the delivery of United States mail.

On September 13, 1963, the defendant, United States, filed its answer in which it alleged that the plaintiff Sullivan was riding in an automobile being driven by J. O. Kelly (the plaintiff in Civil Action No. 1751), who was guilty of negligence in that "he failed to keep a proper lookout for automobiles ahead of him and said negligence was a direct, proximate cause of the collision with the automobile driven by O. B. Marvin. The plaintiff and J. O. Kelly were at the time of the accident both school administrators, and had made arrangements to travel together to Little Rock, Arkansas, to attend a school administrators workshop under arrangements and were engaged in a joint venture."

Then follows specific allegations of the alleged negligent acts of J. O. Kelly in the operation of the automobile being driven by him in which the plaintiff Sullivan was riding.

In his original complaint plaintiff Sullivan sought recovery of $30,000 for personal injuries and medical expenses. On December 28, 1963, by amendment, the plaintiff Sullivan increased the amount he sought to recover to the sum of $75,000 for progressive personal injuries and medical expenses on account of alleged changes in the physical and mental condition of the plaintiff Sullivan. On February 28, 1964, the plaintiff filed his second amendment to his complaint in which he again increased the amount he sought to recover to $125,000 for personal injuries and medical expenses because of alleged changes in the physical and mental condition of plaintiff Sullivan.

On October 18, 1963, a pretrial conference was held in both cases, and it

appearing to the court that the actions involved a common question of fact and law, the court on said date entered an order consolidating the cases for trial in accordance with the provisions of Rule 42(a), Fed.R.Civ.P. The cases as consolidated were tried to the court without a jury on March 23 and 24, 1964.

Jurisdiction is vested in the court under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, inclusive and Sec. 1346(b).

On Saturday, March 21, 1964, preceding the trial date, the defendant filed a motion for continuance of Civil Action No. 1750, Sullivan, on the ground that at 4:20 p. m., Friday, March 20, 1964, the attorney for plaintiff Sullivan by telephone advised the United States Attorney "that all medical tests and reports concerning the physical and mental condition of John E. Sullivan had not been delivered to the United States Attorney because on this morning psychological tests had been conducted on John E. Sullivan, the purpose of which was to furnish a basis for expert testimony as to the mental condition of John E. Sullivan. Results of said test according to Mr. Bassett [one of the attorneys for Sullivan] will not be available until possibly Sunday, March 22, 1964, at the earliest or March 23rd at the latest." The defendant further alleged that it was unable to evaluate the medical testimony in the short time remaining prior to the trial, or to procure physical and psychological examinations of the plaintiff Sullivan.

A response to the motion for continuance was filed on March 23, a few minutes before the scheduled beginning of the trial. Upon a consideration of the motion for continuance and the response thereto, the court entered the following order:

"On this March 23, 1964, comes on for consideration defendant's motion for continuance of the above styled cases, and it is ordered that the said motion be and is hereby overruled, upon the condition that if during the trial it appears that fairness dictates that the defendant, United States of America, should

have additional time to rebut psychological evidence, the said defendant will be given a reasonable period of time in which to evaluate the psychological tests conducted on the plaintiff, John E. Sullivan, and to secure expert opinion relative thereto, in rebuttal to testimony introduced on behalf of the said plaintiff."

Upon the entry of such order the cases proceeded to trial, and on the next day, March 24, at the conclusion of the evidence, the court announced that the cases "are submitted and taken under advisement by the court, subject to the defendant's evaluation of psychological tests conducted on the plaintiff, John E. Sullivan; the defendant is allowed ten days in which to evaluate said tests and to secure expert opinion relative thereto, in rebuttal to testimony introduced on behalf of said plaintiff, and cross-examination of plaintiff Sullivan's witness, Dr. E. Phillip Trapp, is postponed, subject to a later cross-examination if counsel for the defendant desires to do so."

On April 3, 1964, the defendant, United States, filed its motion, in which it alleged:

"On March 25, 1964, the United States Attorney after discussing the matter with Dr. H. M. Hawkins, Psychiatrist, forwarded by registered mail the medical record of the plaintiff made in Fayetteville, Arkansas, in April and August, 1963, and those made in Little Rock in October, 1963. On March 27, 1964, by registered mail the psychological test data and report of Dr. E. Philip Trapp were forwarded to Dr. Hawkins, having received the same on that day from counsel for plaintiff. On March 31, 1964, transcript of testimony having been made available, the same was sent by registered mail to Dr. Hawkins, all of which was done for the purpose of seeking advice as to the manner in which the Government should proceed."

The Dr. Hawkins from whom the United States Attorney sought advice is Chief Psychiatrist, Veterans Administration, North Little Rock Hospital Division, and he advised the United States Attorney at 4:00 p. m. on April 2 that the medical questions presented to him could only be answered upon examination of plaintiff (Sullivan) by a qualified psychiatrist, and that such examination could not be conducted by him without the express permission of the Director of the hospital. The next day the United States Attorney, after attempting to contact the Director, who was unavailable, was advised by Dr. Davis, his assistant, that the medical staff of the Veterans Hospital would be unable to furnish the necessary service.

Upon the filing of the motion, the court on the same day, April 3, 1964, entered an order allowing the defendant "three weeks from this date in which to secure competent medical authority to examine the plaintiff [Sullivan] in the above entitled cause relative to his mental condition and the cause of same."

In accordance with the orders above mentioned the United States Attorney made every effort to obtain additional testimony relevant to the psychiatric and psychological condition of the plaintiff Sullivan. After exhausting all other means of obtaining such evidence, he employed Dr. Stephen B. Finch of Fayetteville, and furnished Dr. Finch with a copy of the testimony of Dr. E. Philip Trapp, and also arranged for the physical examination by Dr. Finch of the plaintiff Sullivan. When the United States Attorney received the report of Dr. Finch, he advised the court that he was unable to obtain additional relevant testimony and candidly filed the report of Dr. Finch dated April 29, 1964, as part of the testimony in the case.

The attorneys did not submit oral arguments in support of their respective contentions at the conclusion of the trial on March 24, 1964, but after the announcement of the United States Attorney of April 29, 1964, relative to his request for additional time to procure additional testimony, the parties submitted briefs in support of their respec-

tive contentions and the case is now ready for consideration and disposition.

On April 4, 1963, the date of the collision of the automobiles, the plaintiff Kelly was and had been for several years a teacher and superintendent of the Springdale, Arkansas, schools.

The plaintiff Sullivan likewise was a teacher and for several years had been superintendent of the Greenland, Arkansas, schools. Springdale, Arkansas, is approximately 8 or 9 miles north of Fayetteville, and Greenland is approximately 5 miles south of Fayetteville on U. S. Highway 71. For years the plaintiffs had been accustomed to travel to teachers meetings in Little Rock in the same automobile. A school administrators workshop was to convene in Little Rock, Arkansas, in the early afternoon of April 4, 1963, and Kelly had sent word to Sullivan that he was driving to Little Rock in his automobile and invited Sullivan to accompany him. In accordance with this arrangement Kelly arrived at Greenland at 9:00 o'clock that morning, where Sullivan entered the car, and they started their journey to Little Rock along and upon Highway 71, a highly improved highway. The highway runs generally north and south at the place of the collision and has two lanes for traffic moving northward and one lane for travel going south. The two northbound lanes, often referred to by the witnesses as the "east" lanes, are separated by a single white line, but are separated from the southbound lane by a double yellow line. All of the lanes are of ample width.

Prior to reaching the point of the collision, they had come through a curve to the right, approximately 1,000 feet north of the point of collision. Kelly was driving his car, a 1962 Cadillac Deville Coupe, and was proceeding southward in the traffic lane provided for traffic moving in that direction.

O. B. Marvin was a rural mail carrier operating out of Mountainburg, Arkansas, and in the discharge of his duties as a rural mail carrier, had been traveling north along the highway, but in order to make a mail delivery, he left the highway on the west side and entered a private driveway which extended several hundred yards to the west, where he delivered mail to the boxes of patrons living in that immediate area. After delivering the mail he traveled back east along the private driveway for the purpose of entering the highway and proceeding northward in the discharge of his official duties as mail carrier. There was a cattle guard across the private driveway at a distance of 40 feet west from the west side of the highway. He was driving along the private driveway about 10 to 15 miles per hour, and stopped at or near the cattle guard before attempting to enter the highway. He first looked to his left or the north for oncoming traffic, and then looked to the south for traffic moving to the north. It was his intention to cross the west or southbound lane and enter one of the east lanes to continue northward in the discharge of his duties. He observed a truck at a distance of several hundred yards south of the point of impact proceeding northward in the east or outside northbound lane. After looking first to his left or north, he apparently gave his attention to the truck that was approaching from the south and occupying one of the lanes of traffic which he desired to enter in order to proceed northward.

There was nothing to obstruct the view of the mail carrier Marvin or the driver of the automobile, the plaintiff Kelly, or the plaintiff Sullivan, for a distance of at least 500 or 600 feet from the entrance of the private driveway to the highway. Kelly did not see the mail carrier approaching the highway until he was approximately 300 feet north of the point of impact. He testified that at that time Marvin was 30 or 40 yards from the west edge of the pavement. Marvin stopped at the cattle guard which by actual measurement was, as heretofore stated, 40 feet from the entrance to the highway. The court is of the opinion that plaintiff Kelly intended to say that when he saw the mail carrier approaching that he was a distance of 30 or 40 feet from the high-

way rather than 30 or 40 yards. Evidently at the time Kelly saw the mail carrier, Marvin had stopped or slowed almost to a stop as he approached the cattle guard, and Kelly never saw the mail carrier any more until Marvin had entered the highway. However, as heretofore stated, there was nothing to prevent the plaintiff Kelly from seeing the mail carrier's approach to the highway. Likewise, there was nothing to prevent the mail carrier, Marvin, from observing the approach of the automobile being driven by Kelly.

From the curve, hereinbefore referred to, north of the point of impact, Kelly was driving in the west or southbound lane between 50 and 60 miles per hour on a slightly downhill straight stretch of the highway. The mail carrier, O. B. Marvin, was driving east at from 10 to 15 miles per hour along the private driveway leading to the west side of the highway. The collision occurred near the double line which divides the southbound traffic lane from the inside northbound lane. The plaintiff Kelly made no effort to stop or slow the speed of his automobile until the mail carrier, Marvin, had entered or was entering the traffic lane. At that time plaintiff Kelly swerved to his left or to the east. The right front of the Cadillac and the left front of the Chevrolet, the mail carrier's automobile, collided. The Chevrolet did not leave the pavement, but the Cadillac driven by the plaintiff Kelly proceeded southeasterly across the highway and into the ditch and across the ditch and into a field. It came to rest 300 feet from the point of impact.

The plaintiff Sullivan was occupying the right front seat and he did not see the mail carrier, Marvin, approching the highway. He was not looking in that direction at the time of the collision, but was looking for a house that he thought was occupied by an acquaintance. There is no testimony which indicates that the status of the plaintiff Sullivan was any other than that of a passenger in the automobile of the plaintiff Kelly.

Both plaintiffs and the mail carrier, Marvin, received personal injuries and were removed to the hospital by ambulance from the scene of the accident.

Title 28 U.S.C. § 2674, provides that the United States shall be liable in suits based on the Tort Claims Act, "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." Therefore, the substantive law of Arkansas governs the rights and liabilities of the parties, and in determining the claims of the plaintiffs and the claims of the defendant, each case should be considered separately.

### J. O. Kelly v. United States
### Civil Action No. 1751

In his complaint the plaintiff Kelly generally alleged that O. B. Marvin operated his automobile in such "a careless, willful, negligent and unlawful manner as to cause and permit said automobile to strike and collide with the automobile which the plaintiff, J. O. Kelly, was then and there driving, thus proximately causing, producing and bringing about the injuries and damages hereinafter complained of."

The specific acts of negligence alleged by plaintiff Kelly are that O. B. Marvin failed to keep the automobile which he was driving under proper control and under such control as was reasonable and prudent under the circumstances; that he failed to keep and maintain a proper lookout for persons and property traveling upon the highway; that he failed to yield the right of way to the plaintiff, J. O. Kelly; and failed to exercise reasonable care under the circumstances then and there existing.

The defendant in its answer denied that O. B. Marvin was negligent in any manner in the operation of the automobile he was driving, and specifically alleged that the plaintiff Kelly was guilty of negligence (1) in failing to keep a proper lookout for automobiles ahead of him and in his lane of travel; (2) failed to keep his car under control; (3) failed to exercise reasonable care under the

circumstances then and there existing; and "that said negligence was the sole and proximate cause of the collision with defendant's automobile."

The defendant also alleged that the plaintiff Kelly was guilty of contributory negligence and that the collision was the result of an unavoidable accident.

Ark.Stat.Ann. Sec. 75–624 (1957 Repl.), provides:

"The driver of a vehicle about to enter or cross a highway from a private road or driveway shall yield the right-of-way to all vehicles approaching on said highway."

In Sunday v. Burk (D.C.W.D.Ark. 1959) 172 F.Supp. 722, this court considered this statute, and held that the defendant was guilty of negligence in entering a highway from a private driveway without first keeping a proper lookout for vehicles which might be traveling on the highway.

■ Without doubt, Marvin stopped at a cattle guard across the private driveway before entering upon the highway. The cattle guard was at least 40 feet from the west edge of the southbound lane, in which the plaintiff Kelly was driving. Had Marvin been maintaining an efficient lookout at the time he stopped, he would have seen the Kelly car approaching from the north, but Marvin proceeded to enter the highway without again looking to the north, and was in the lane in which Kelly was driving before he saw the Kelly car approaching. Evidently Marvin was watching the truck that was approaching from the south and in the east lane of the northbound traffic. The court is convinced that Marvin was guilty of negligence in entering upon the highway in the manner in which he did, and that such negligence was a proximate cause of the injuries and damages that resulted.

In Yocum v. Holmes (1953), 222 Ark. 251, 258 S.W.2d 535, the court quoted from the case of Northwestern Casualty & Surety Co. v. Rose (1946), 185 Ark. 263, 46 S.W.2d 796, and at page 256 of 222 Ark., at page 538 of 258 S.W.2d said:

" 'It is the well-settled rule that the duty rests upon the driver of an automobile to exercise ordinary care in its operation and in the exercise of such care it is his duty to keep a constant lookout to avoid injury to others.' "

■ A driver of an automobile must exercise a degree of care commensurate with the dangers anticipated and the injuries that are likely to result from the driving of the automobile. The more dangerous the character of the vehicle, of course, the greater the degree of care required. Bona v. S. R. Thomas Auto Co. (1919), 137 Ark. 217, 208 S.W. 306.

■ The evidence did not disclose that Kelly was driving his automobile in excess of 60 miles per hour, but the fact that Kelly may not have been operating his automobile at a speed in excess of the statutory limits of 60 miles per hour does not establish that he was not guilty of contributory negligence.

In Craighead v. Missouri Pac. Transp. Co. (8 Cir. 1952), 195 F.2d 652, the court at page 655 quoted from Bona v. S. R. Thomas Auto Co., supra, as follows:

" 'The true test in all cases is whether or not the driver has used such care and caution as a careful and prudent person would have done under the same circumstances, and a driver of automobiles is not exempt from negligence by simply showing that at the time of the accident he was not running at a rate of speed greater than that allowed by law; for ordinary care, under the circumstances of the particular case, might require that he be operating his machine at even a lower rate of speed than the limit fixed by law. To enable him to avoid a collision with another person, ordinary care might require that he should have his machine under such control that he not only could slow up, but also stop.' "

Ark.Stat.Ann. Sec. 75–601 (1963 Supp.), provides:

"(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care."

Had the plaintiff Kelly been so operating his automobile and keeping an efficient lookout, he could have stopped the car in time to avoid striking the automobile of Marvin, or he could have sounded his horn so as to attract the attention of Marvin before he entered the highway.

In Shroeder v. Johnson (1926), 234 Ark. 443, 352 S.W.2d 570, the court quoted with approval the following from Ness v. Males, 201 Md. 235, 93 A.2d 541, 543:

" 'We have held that the statutory obligation to yield the right of way at a stop intersection, imposed upon the unfavored driver, is not discharged by a mere stop but extends to the entire passage across the favored highway, and that the favored driver using a through highway is not required to slow down at an intersection or bring his vehicle under such control as to be able to stop, upon the assumption that an unfavored driver will fail in his duty.' "

Notwithstanding the fact that it was the duty of Marvin to yield the right of way to the plaintiff Kelly, yet had Kelly exercised ordinary care in the driving of his automobile and had he kept an efficient lookout, he would, without doubt, have seen Marvin approaching the highway and in a place of danger in time to have either stopped or turned to his left into the vacant inside northbound lane of traffic.

Thus, the court is of the opinion that plaintiff Kelly was guilty of contributory negligence which contributed to the collision and the injuries and damages, and without which the injuries and damages would not have occurred, but the contributory negligence of the plaintiff Kelly was of less degree than the negligence of Marvin.

Ark.Stat.Ann. Sec. 27–1730.2 (1962 Repl.), provides:

"In all actions hereafter accruing for negligence resulting in personal injuries or wrongful death or injury to property, contributory negligence shall not prevent a recovery where any negligence of the person so injured, damaged, or killed is of less degree than any negligence of the person, firm or corporation causing such damage; provided that where such contributory negligence is shown on the part of the person injured, damaged or killed, the amount of the recovery shall be diminished in proportion to such contributory negligence."

The plaintiff Kelly at the time of the collision was 62 years old. He received injuries on his right kneecap or patella. One wrist was strained and he received bruises and abrasions in the region of his stomach and on his head. It was necessary to surgically remove about ½ or ¼ of his kneecap at the point where the muscles attach thereto. This naturally reduces flexion. His right leg was placed in a cast which he wore about three weeks. There is some grating or rubbing because of the rough surface of the patella which is likely to cause traumatic arthritis in the knee joint. It would require an expenditure of approximately $500 to remove the remaining portion of the patella. Such removal would stop any pain in the joint, but the quadriceps' mechanization function would be reduced by the complete removal of the patella. Dr. H. E. Martin, the orthopedic surgeon who treated the plaintiff Kelly, testified that there will be a 15 percent disability of the knee assuming traumatic arthritis develops, but that the knee pres-

ently had normal flexion. However, Dr. William B. Stanton, orthopedic surgeon of Fort Smith, Arkansas, testified that the plaintiff Kelly suffered a disability to the body as a whole of 15 percent.

His grip is impaired by the strain suffered in the wrist, and there is a loss in the rotary motion of the wrist. Without doubt Kelly suffered considerable pain for several weeks and was suffering reduced pain at the date of the trial. Because of his age he will not likely recover full muscle power or muscular coordination.

He did not return to his duties for 21 days, and during that time his salary was $448.77. He has paid his physicians $300.00; the hospital, $374.75; ambulance, $55.00; and incidental medical expenses of $20.00.

■ The value of the Cadillac owned and driven by the plaintiff Kelly immediately prior to the collision was approximately $5,000. A used car dealer, Mr. Leslie, testified that the value of the Kelly automobile immediately after the accident was $1,800.00, but it was sold to 62 Auto Salvage of Fayetteville, Arkansas, on April 27, 1963, for $2,250.00. Thus, the damage to the automobile was $2,750.00. He suffered a disability to his body as a whole of at least 15 percent. But for his contributory negligence he would be entitled to recover the sum of $20,000.00, for his injuries and damages. However, since he was guilty of contributory negligence, the damages must be diminished in proportion to such contributory negligence. It is difficult to determine the exact percentage that his damages should be diminished, but the court feels that justice requires that the damages be diminished 40 percent, thus leaving plaintiff Kelly entitled to recover the total sum of $12,000.00.

*John E. Sullivan v. United States*
*Civil Action No. 1750*

■ The court has found that the plaintiff Sullivan was occupying the right-front seat, and that he did not see the approach of the car until the cars collided near the center of the highway.

The condition of the highway and the scarcity of traffic thereon were such that it cannot be said that the plaintiff Sullivan failed to exercise ordinary care for his own safety by not noting the approach of the mail carrier's automobile from the west along a private driveway to the highway and in not advising Kelly of the approach of the mail carrier.

■ The defendant makes no contention that Sullivan and Kelly were engaged in a joint enterprise, and certainly the evidence does not establish that they were so engaged. In Woodard v. Holliday (1962), 235 Ark. 744, 361 S.W.2d 744, the court at page 746 of 235 Ark. at page 745 of 361 S.W.2d said:

"This court has consistently held that in order for a joint enterprise to arise two fundamental and primary requisites must concurrently exist, to-wit: A community of interest in the object and purpose of the undertaking in which the automobile is being driven and an equal right to direct and govern the movements and conduct of each other in respect thereto. If either or both of these elements is absent, there is no joint enterprise. Stockton v. Baker, 213 Ark. 918, 213 S.W.2d 896."

■ In the absence of an understanding between the driver and the passenger that the passenger has an equal right to be heard as to the manner in which the automobile is driven, that is, an equal voice in the control of the automobile, there is no joint enterprise. Reed v. Humphries (1963), 237 Ark. 315, 373 S.W.2d 580. Thus, the negligence of the plaintiff Kelly is not imputable to the plaintiff Sullivan. In Missouri Pac. Railroad Co. v. Henderson (1937), 194 Ark. 884, 110 S.W.2d 516, the court at page 889 of 194 Ark. at page 520 of 110 S.W.2d said:

" * * * The appellees, Henderson and Stanfill, were invited guests, they had no control over the movement of the automobile in which they were riding; and Ingram's negligence, however gross, cannot be im-

puted to them. Therefore, we must look to the evidence only as it relates to their failure to exercise ordinary care for their own safety."

The defendant contends that the plaintiff Sullivan was guilty of contributory negligence in failing to keep an efficient lookout for automobiles ahead of him and that such failure on his part was a contributing cause of the injuries and damages.

In Elmore, Admr. v. Dillard (1957), 227 Ark. 260, 298 S.W.2d 338, the court at page 265 of 227 Ark. at page 342 of 298 S.W.2d said:

" * * * The general rule is that the occupant of a car has the duty of exercising ordinary care for his own safety. This rule is well stated in 65 C.J.S., Negligence, § 152, p. 795, in this way:

" 'While an occupant of a vehicle is not required to exercise the same watchfulness as the driver, it is his duty to exercise ordinary care, including a reasonable use of his faculties of sight, hearing, and intelligence, to observe and appreciate danger or threatened danger of injury, and, if he fails to do so, and such failure contributes to the injury complained of as a proximate cause, he is guilty of contributory negligence.' "

In Willbanks v. Laster (1947), 211 Ark. 88, 199 S.W.2d 602, the court, beginning at page 90 of 211 Ark. at page 604 of 199 S.W.2d, said:

"The defense of contributory negligence is based first upon the admission of appellee that she was not keeping a lookout, and did not warn her husband that he was ignoring the stop sign. While both the driver of a car and his guest are alike under the duty of exercising ordinary care, the conduct required to comply with that duty is ordinarily different because of the difference in the circumstances. The subject is extensively annotated in the case of Leclair v. Boudreau, 101 Vt. 270, 143

A. 401, 63 A.L.R. 1427. In the case of Arkansas Valley Co-op. Rural Elec. Co. v. Elkins, 200 Ark. 883, 141 S.W.2d 538, 542, we quoted with approval the following statement from 5 Am.Jur., sec. 475, p. 769: 'A person riding in an automobile driven by another, even though generally not chargeable with the driver's negligence, is not absolved from all personal care for his own safety, but is under the duty of exercising reasonable care to avoid injury. The care exacted is that which an ordinarily prudent person would exercise under like circumstances. The law fixes no different standard of duty for a passenger in an automobile than for the driver. Each is bound to use reasonable care. What conduct on the passenger's part is necessary to comply with this duty must depend upon all the circumstances, one of which—and unquestionably an important one—is that he is merely a passenger having no control over the management of the vehicle in which he is riding.' " See, also, Stockton v. Baker (1948), 213 Ark. 918, 213 S.W.2d 896.

In view of the evidence, the circumstances existing at the time and immediately before the collision, and the relationship of Kelly and Sullivan, the court is of the opinion that Sullivan was not guilty of contributory negligence in failing to see the automobile of Marvin approaching the highway and in failing to warn the plaintiff Kelly of such approach, and insofar as the claim of Sullivan is concerned, he is entitled to recover the full amount of the damages sustained by him.

The court has heretofore stated that the plaintiff Kelly, the mail carrier Marvin, and the plaintiff Sullivan received severe personal injuries in the collision of the automobiles, but the injuries received by Sullivan were much greater and the results more devastating than the injuries received by the plaintiff Kelly. The evidence as to the nature and

extent of the injuries received by Sullivan is not in serious or substantial conflict.

At the time of the collision, Sullivan was in his 52nd year. He had been a school teacher for many years and superintendent of the Greenland, Arkansas, schools. His salary was $7,200.00 per year. Following the injuries, he was confined in a hospital at Fayetteville, Arkansas for 31 days during which time he suffered severe pain from the crushed kneecap and from his head injuries. He was hospitalized again in August 1963 for 5 days because of an attack of meningitis which the testimony indicates was proximately caused by the injuries sustained in the collision. During this hospitalization, the muscles of his head, neck and back were rigid and in painful spasm. In October 1963 he was hospitalized in Little Rock for 12 additional days undergoing severely painful tests by which the extent of his brain injuries resulting from the collision were well defined. He underwent practically every test known to medical science in an effort to determine the extent and cause of the pain and suffering that he was enduring, and in the hope of obtaining relief. He expended for hospitalization and medical services the sum of $2,503.35 during the first 31 days in the hospital; $342.30 expenses were incurred as a result of the attack of meningitis; and $799.30 was the cost of the hospitalization in Little Rock and the tests that were conducted. He was entirely absent from his work as superintendent of schools for 48 days. His salary for that time was $960.00. Of that amount $300.00 was paid under sick leave benefits (15 days) and the remaining $660.00 was paid as a gratuity by the School Board.

He was treated in the hospital at Fayetteville, Arkansas, by a noted orthopedic surgeon for a comminuted fracture of the left kneecap, and it was necessary to perform an open reduction of the fracture and to wire the several broken pieces of bone together. The fracture extended into the joint and has caused traumatic arthritis which is a constant source of pain, and disables him in the use of his left lower extremity to the extent of 50 percent. In addition, he sustained injuries to both his cervical and lumbar spine, which aggravated a preexisting arthritic condition.

The injuries above referred to, and established by the testimony of the orthopedic surgeon who treated him, caused a disability to his body as a whole of approximately 20 percent. The orthopedic surgeon who examined Sullivan at the request of the defendant rated his disability to the body as a whole as a result of the orthopedic injuries at 15 percent. These disabilities are in addition to the serious and permanent injuries to his brain and musculo-skeletal system, which, in combination with the other injuries, have in effect permanently disabled him from any significant gainful employment. The intellectual loss is such as to prevent him from engaging in any kind of work requiring more than rudimentary intellectual efforts, and his orthopedic injuries are such as to prevent him from engaging in manual labor or remaining on his feet for any extended period of time. There was some testimony which indicated that the cortical atrophy was caused by the attack of meningitis, but the attack was brought on by the injuries received in the collision.

It doesn't seem necessary for the court to set forth the various tests and treatments that Sullivan has received. Without doubt his injuries are so serious in nature as to disable him completely from working in his former capacity as a school superintendent.

The court has heretofore referred to the time allowed the United States Attorney to investigate the medical testimony produced at the trial by Sullivan. When the United States Attorney received the report of Dr. Stephen B. Finch after a thorough post-trial examination of Sullivan, he advised the court that defendant did not desire to introduce any additional testimony relative to the injuries suffered by Sullivan, and consented to file the report of Dr. Finch as a part of the evidence. During the examination of

Sullivan by Dr. Finch, he reviewed the psychological testing, the chart from the Washington General Hospital at Fayetteville, the findings of the Medical Center at Little Rock, and some of the current literature relative to similar injuries, and based upon the examination and review of the entire medical record, Dr. Finch, inter alia, stated:

"(1) * * * at the present time, the patient is suffering from a chronic brain syndrome and shows the pattern of diffuse neuronal loss throughout the substance of the brain. He demonstrates emotional lability, in which he cries or laughs very easily, being much more able to cry and is quite irritable. He shows spotty deficits in intellectual functioning. He has a moderate impairment in recent memory, remote memory remains intact. His ability to calculate and use figures is moderately to severely impaired. The impairment increases as the patient tires so he could not handle calculations over any period of time. His fund of general information is fairly well intact, particularly that information that he has learned awhile back, however, his ability to learn new information is greatly impaired. His judgment is very poor. In some instances, he seems to demonstrate fairly good judgment and then he will make a rather bizarre judgmental mistake in tests of judgment. His abstracting ability, in other words, his ability to handle abstract concepts and make administrative decisions is impaired to the extent to where he could not hold an administrative position. His level of occupational adjustment would probably be that of a clerk in a department store, if he had an understanding manager or boss who would let him rest frequently, however, I do not feel that he could resume any activities such as the ones that he has done in the past. I feel that this is probably a fairly permanent and stable adjustment at the present time and

is neither likely to improve nor deteriorate.

"(2) The patient is also suffering at the present time from a psychoneurotic depressive reaction of the reactive type, secondary to the realization of his loss of function. It as now been brought home to him by the loss of his job and his inability to function in areas where he apparently has previously been able to function and he is quite depressed over this. Thirdly, under present condition, the psychological testing has been reviewed in its entirety and I can find no discrepancy in its findings and feel that it does show that this man has suffered loss in function from a previously much higher level."

In the penultimate paragraph of the report of Dr. Finch, he stated:

"Finally: Taking all the above mentioned factors into consideration and having reviewed some aspects of this case with a pathologist and a radiologist, it is my considered opinion that this man's present level of functioning is greatly below his previous level of functioning, that he will have a difficult time supporting himself. I feel that there is a very great likelihood that this is due to the trauma suffered on April 4, 1963, although I cannot be absolutely positive about this."

At the time of the injuries the plaintiff Sullivan had a life expectancy of 21¼ years.

The extent, the nature and the result of the injuries received by him, when considered, are such as to convince the court that the plaintiff Sullivan has suffered damage in a substantial amount, and considering (1) past and future pain, suffering and mental anguish, (2) past and future medical expenses, (3) loss or diminution of earning capacity, and (4) permanence of the injuries, the court is of the opinion that an award of $75,-000.00 is required as reasonable compensation.

Therefore, a judgment in favor of the plaintiff, J. O. Kelly, in Civil Action No. 1751 for $12,000.00 and costs, and a judgment in favor of the plaintiff, John E. Sullivan, in Civil Action No. 1750 for $75,000.00 and court costs should be entered. The judgment in each case should further provide for the allowance of reasonable attorneys' fees to the attorneys representing the plaintiffs of 20 percent of the amount awarded in each case, to be paid out of but not in addition to the amount of the judgment.